## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **GARRISON BUILDERS, LLC and** | ) **CIVIL ACTION NO.:** |
| | ) |
| **SANDERSON SERVICES, LLC** | ) **CLASS ACTION COMPLAINT** |
| **Plaintiffs** | ) |
| | ) **Judge:** |
| **VERSUS** | ) |
| | ) **Mag. Judge:** |
| **FORD MOTOR COMPANY** | ) |
| | ) |
| **Defendant** | |

*************************************************************************

## CLASS ACTION COMPLAINT

Plaintiffs, **GARRISON BUILDERS, LLC** and **SANDERSON SERVICES, LLC**, on

behalf of themselves and all others similarly situated alleges as follows:

## INTRODUCTION

1.      Defendant Ford Motor Company has sold—and continues to sell—millions of diesel

trucks equipped with high-pressure fuel injection pumps; specifically, Bosch-supplied CP4 high

pressure fuel injection pumps, that fail, wholly unbeknownst to an unassuming American consumer

who pay significant amounts for these vehicles' advertised "durability," "longevity," and "topnotch

fuel economy."  Ford promised consumers the continued reliability of their diesel engines with

increased fuel efficiency and power at greater fuel efficiency.  However, this came with a hidden

and catastrophic cost that was secretly passed on to consumers.  Specifically, the Bosch-supplied

CP4 high pressure fuel injection pump, which unbeknownst to consumers is a ticking time bomb

when used in American vehicles.  As Ford knew before and during the Class Period (2011–present),

Bosch's CP4 pump was never compatible with American fuel standards.  The CP4 pump is not built

to withstand the specifications for U.S. diesel fuel in terms of lubrication or water content, and it struggles to lift a volume of fuel sufficient to lubricate itself.  As a result, the pump is forced to run dry and  destroy itself as air bubbles allow metal to rub against metal.  The pump secretly deposits metal shavings and debris throughout the fuel injection system and the engine until it suddenly and cataclysmically fails without warning, further contaminating the fuel delivery system with larger pieces of metal.  This "catastrophic" (i.e., complete and total) pump failure often occurs as early as "mile 0," as the fuel injection disintegration process begins at the very first fill of the tank. This total fuel injection system failure and consequential engine failure results in an outrageously expensive repair bill, all for a repair that will not truly ameliorate the issue so long as the vehicle is being filled with U.S. diesel.  And, although complete and total pump failure takes time to occur, the defective CP4 pump starts damaging the vehicle's fuel injection system and engine immediately upon the vehicle's first use.  Further, the sudden and unexpected shutoff of the vehicle's engine while it is in motion and then subsequent inability to restart the vehicle present an inherent risk to consumer safety—one which Ford itself has recognized in the past. Thus, Plaintiffs and other Class members have suffered from a defect that existed in the Class Vehicles, upon the first use of the Class Vehicles.  Plaintiffs and other Class members are seeking recovery for this manifested and immediately damaging defect, in addition to any and all consequential damages stemming therefrom.

2.      Ford's company line is to blame the failures on "fuel contamination," which is not covered under their warranties because it is "not caused by Ford." Consumers are left with repair bills that range from $8,000.00 to upwards of $20,000.00 per vehicle. Some victims are American businesses who own several vehicles and have suffered multiple failures. Others have spent several hundred or several thousand dollars attempting to prevent or mitigate these failures. Moreover,

diesel fans pay so much more for their trucks because diesel trucks are expected to last for 500,000 to 800,000 miles, and have more power, and a lower fuel bull. Put simply, Plaintiffs and all members of the proposed Class paid a premium for their diesel vehicles, and were harmed by being sold vehicles with a defective fuel injection pump that is substandard for American fuel.

3.      Ford saw Bosch's CP4 fuel injection pump as another way to make money—to take advantage of consumers' desire to drive diesel vehicles that were reliable, durable, fuel- efficient, and powerful.  After the CP4 fuel injection system worked successfully in vehicles in Europe, Ford sought to use the CP4 system in American vehicles, promising consumers exactly what they were looking for—improvements in torque, horsepower, durability, and fuel economy.  But Ford could never deliver on that promise for American vehicles because the CP4 fuel pump is not compatible with American diesel fuel; in fact, Ford knew before and during the Class Period, and equipped its modern Power Stroke diesel vehicles with the European-designed CP4 fuel pump anyway.

4.      Ford knew, from the specifications of the pump as compared to the specifications of American diesel, the Bosch-made CP4 Pump was clearly incompatible with the ordinary use of American diesel fuel. That is, well before Ford ever chose to implement the CP4 component part (as incorporated in the diesel engines of the subject Class Vehicles), the issue of incompatibility was (or should have been) known and yet was totally ignored in the design of the Class Vehicles' engine systems.  This is further evidenced by the fact that Ford had experience with widespread catastrophic fuel injection pump failures when cleaner diesel standards were first implemented in the 1990s.  By 2002, the Truck & Engine Manufacturers Association ("EMA")—of which Ford is a member company—acknowledged that the lower lubricity of American diesel could cause catastrophic failure in fuel injection system components that are made to European diesel specifications.  Not only did Ford fail to inform American consumers and fail to stop touting the

fabricated benefits of the vehicles containing CP4 pumps, Ford attempted to shift the blame to the American consumers. For instance, in 2010, Ford claimed it was *consumers'* improper use of contaminated or substandard fuels that damaged the vehicles' fuel system, even when Ford knew that the malfunction was *actually* the result of the CP4 fuel injection pump design, which was simply not fit for American diesel fuel.

5.      Vehicle engines with the Bosch CP4 fuel injection pumps are not compatible with American fuel, and Ford's conduct is not compatible with American law. Ford knowingly and intentionally deceived American consumers through its individual representations to respective consumers in a (successful) effort to increase revenues and profits at the expense of consumers.

6.      Plaintiffs and similarly situated Class members have suffered from an innately manifested—though not readily apparent—defect that existed in the Class Vehicles prior to purchase (or lease), and which began damaging the Class Vehicles and their fuel delivery systems upon first use. Plaintiffs were thus injured at the point of sale and throughout their ownership of the vehicle and paid far more than they would have if Ford had told the truth. Indeed, Plaintiffs and no reasonable consumer would have bought these vehicles if Ford had told the truth.

7.      These consumers are entitled to be reimbursed for the hundreds of millions of dollars Ford fraudulently obtained from them, and to be compensated for their actual losses.

## JURISDICTION AND VENUE

8.      This Court has federal question jurisdiction under 28 U.S.C. § 1332. Additionally, this Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C §1711 *et seq.*, because the aggregate amount in controversy exceeds $5,000,000.00 exclusive of costs and interest, the proposed Class consists of 100 or more members, and minimal diversity exists. This Court also has supplemental jurisdiction over the state law claims. 28 U.S.C

§ 1367.

9.     Venue is proper in this District under 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to these claims occurred in this District.  Plaintiffs are domiciled in this District and purchased the vehicles at issue in this District.

## PARTIES

10.     Plaintiff, **GARRISON BUILDERS, LLC** is a Louisiana limited liability company which purchased a 2019 Ford F-250 from Matt Bowers Ford in Metairie, Louisiana, an authorized Ford dealership.  The vehicle bears the VIN 1FT7W2BT9KEF46351.  In the days and weeks preceding Plaintiff's purchase, Plaintiff saw Ford's television commercials, internet advertisements, sales brochures, and heard statements from dealer sales representatives wherein Ford claimed the diesel truck, like the one Plaintiff would purchase, had superior horsepower, reliability, and durability compared to other diesel trucks in the American market. On the date that Plaintiff purchased the vehicle, and in purchasing the vehicle, Plaintiff relied on representations from Ford and its dealership sales representatives that the vehicle was compatible with American diesel fuel, was durable, and was reliable. Plaintiff relied on these representations in purchasing the vehicle and, absent these representations, would not have purchased the vehicle and/or would have paid less for it. These knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the Class Vehicle's reputation for maintaining a high resale value, caused Plaintiff to purchase the Class Vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers.  Consequently, the vehicle could not deliver the advertised

combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and/or unexpectedly defective nature of the Ford Super Duty diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of Ford's wrongful, deceptive conduct, and would not have purchased the Class Vehicle or would have paid less for it, had Ford not concealed the CP4 fuel injection system defects. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff thusly brings claims individually and as a representative of the Class.

11.     Plaintiff, **SANDERSON SERVICES, LLC** is a Louisiana limited liability company which purchased a 2017 Ford F-250 from Veterans Ford in Metairie, Louisiana, an authorized Ford dealership. The vehicle bears the VIN 1FT7W2BT4HEB13187. In the days and weeks preceding Plaintiff's purchase, Plaintiff saw Ford's television commercials, internet advertisements, sales brochures, and heard statements from dealer sales representatives wherein Ford claimed the diesel truck, like the one Plaintiff would purchase, had superior horsepower, reliability, and durability compared to other diesel trucks in the American market. On the date that Plaintiff purchased the vehicle, and in purchasing the vehicle, Plaintiff relied on representations from Ford and its dealership sales representatives that the vehicle was compatible with American diesel fuel, was durable, and was reliable. Plaintiff relied on these representations in purchasing

the vehicle and, absent these representations, would not have purchased the vehicle and/or would have paid less for it. These knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the Class Vehicle's reputation for maintaining a high resale value, caused Plaintiff to purchase the Class Vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and/or unexpectedly defective nature of the Ford Super Duty diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of Ford's wrongful, deceptive conduct, and would not have purchased the Class Vehicle or would have paid less for it, had Ford not concealed the CP4 fuel injection system defects. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff thusly brings claims individually and as a representative of the Class.

12.    Defendant Ford Motor Company ("Ford") is a publicly traded corporation organized under the laws of the State of Delaware with its principal place of business at One

American Road, Dearborn, Michigan 48126.

13.     Defendant Ford designs, manufactures, distributes, and sells Ford automobiles in this District and multiple other locations in the United States and worldwide.  Ford and/or its agents designed, manufactured, and installed the engine systems in the Class Vehicles.  Ford also developed and disseminated the materially misrepresentative owner's manuals and warranty booklets, advertisements, and other intentionally unreasonable and deceptive promotional materials relating to the Class Vehicles.  Ford also designed advertising material that it sent to Ford Dealerships for the purpose of having dealers distribute these to consumers, and Ford authorized dealers to communicate with consumers about the performance of the vehicles.

## FACTS

### Class Vehicles

14.     For purposes of this Complaint, the "Class Vehicles" consist of Ford- manufactured diesel-fueled automobiles equipped with a 6.7L Power Stroke engine, ranging from the 2011– present model years. All vehicles falling under this Class Vehicle group were manufactured with the defective CP4 fuel injection pump.

15.     Diesel engines have long enjoyed a loyal following in some U.S. market segments because of their reliability, fuel efficiency, and power. Diesel engines produce higher torque, even at low revolutions per minute ("RPM"), making them popular in buses, heavy-duty pickups, and vans, including commercial vehicles, farm trucks, and ambulances.

16.     With the invention of common-rail systems, diesel fuel was injected at higher pressure, forming a finer mist that increases fuel efficiency and power. Common-rail systems also made diesel engines burn cleaner and with less noise. While diesel had long been popular overseas, these advances fueled a growing market here in the U.S. for diesel trucks, and even diesel

passenger cars.

17.    From the outset, Ford was in competition with fellow "Big Three" auto manufacturers like General Motors and Fiat Chrysler, each racing to dominate the growing American diesel vehicle market. Ford looked to Europe and the expertise of international automotive parts supplier Bosch to increase the fuel efficiency and power of its diesel engines. The heart of this diesel revolution would be powered by Bosch's extremely durable CP3 fuel injection pump, the predecessor to the CP4 fuel injection pump at issue in this suit. The CP3 pump was one of Bosch's heavy-duty injection pumps, simplified for increased reliability. The reliability of the CP3 became key to the "million-mile" performance of diesel truck engines in the U.S. Not surprisingly, American trust in diesel technology grew.

18.    Americans paid a premium for the increased reliability, fuel efficiency, and power of diesel—and, Bosch promised to continue to deliver advances and continued improvements. Bosch claimed that the next generation of fuel pump, the CP4, would maintain reliability while also increasing fuel efficiency and power.  According to Bosch, the CP4 provides "[demand-based delivery from tank to rail[.]"FN1  In addition, the component manufacturer explains its high- pressure pump, and its function(s), as follows :FN2

> The high-pressure pump CP4 delivers the fuel into the connected rail under high pressure. The CP4 consists of one or two high-pressure elements, each integrated in a housing with its own camshaft. The pump camshaft is driven by belts, chains, or cogwheels and moves the pump pistons to generate the required high pressure.
>
> The fuel is delivered from the tank to the pump via a low-pressure connection. The fuel lines lead from the high-pressure connectors on both high-pressure

1 *See* Bosch's "Products and services" page, available at https://www.bosch-mobility-solutions.com/en/products-and-services/passenger-cars-and-light-commercial- vehicles/powertrain-systems/common-rail-system-piezo/high-pressure-pump-cp4/ (last accessed Dec. 2, 2018).
2 *See id.*

elements to the rail. The metering unit is connected electrically to the control unit and is responsible for the requirement-driven supply of the pump with fuel. Fuel which is no longer needed flows back into the tank via a further low-pressure connection.

The CP4 common-rail pump has proven highly successful on the market. Over 40 million units have been produced globally so far. It has a modular construction, and as Bosch advertises, can be adapted to the customer's needs.

The CP4 handles pressure levels from 1,800 to 2,700 bar and is used for both on- and off-highway applications from passenger cars, light[-] and medium[-]duty vehicles, up to small heavy[-]duty vehicles. [As Bosch purports,] "[t]he variants tailor-made for each segment differentiate themselves with regard to, for example, lifetime, robustness, and maximum flow rate."

The fuel-lubricated CP4 consists of one or two high-pressure elements, each integrated in a housing with its own camshaft. The pump camshaft is driven by belts, chains, or cogwheels and moves the pump pistons to generate the required high pressure. The fuel is delivered as required using an integrated cogwheel pump or electric fuel pump.

The engine control unit enables the delivery of the required quantity of fuel. It communicates with the metering unit or the optional electric suction valve (eSV) on the pump. Use of the eSV improves the filling of the high-pressure pump compared to the variant with the metering unit, especially in the higher speed ranges.

In essence, Bosch's own predominance in the global market carries with it the superficial guarantees of quality and trustworthiness.

19.    The Bosch CP4 Pump operates at higher pressures than its predecessor, the CP3.

The CP4 achieves greater fuel efficiency by pumping less fuel through the engine. The Bosch CP4 Pump had a proven track record in Europe, but it is not compatible with American diesel fuel.

20.    The CP4 relies on the diesel fuel itself to maintain lubrication. The lubricity of

diesel in Europe is more standardized than American diesel, but European diesel is also dirtier. Because the sulfur in diesel exhaust is a major cause of smog and acid rain, in 2007, the EPA required diesel fuel sold in the U.S. to have less than 15 ppm of sulfur. This is known as Ultra Low Sulfur Diesel ("ULSD"). It is produced through a refinery process known as hydrodesulfurization ("HDS"). Sulfur provides some of the lubricity needed for the pump to operate. But more importantly, the refinery process required to produce low sulfur diesel destroys a variety of important nitrogen and oxygen based polar and organic compounds that give diesel fuel its lubricity. Indeed, ULSD fuel is considered to be very 'dry' and incapable of lubricating vital diesel fuel delivery components, specifically high-pressure fuel pumps and injectors; as a result, American diesel does not contain the lubrication necessary for the Bosch CP4 Pump to operate durably, and these fuel injection system components "are at risk of premature and even catastrophic failure when ULSD fuel is introduced to the system."

21.     Ford also provided an express five-year/100,000-mile warranty for the 6.7L Power Stroke diesel engine trucks.

22.     Ford also represented to Ford Power Stroke diesel consumers that, with respect to the 2011–present 6.7L Power Stroke diesel engine, "You may operate your vehicle on diesel fuels containing up to 20% biodiesel, also known as B20," and provided further directions for which diesel fuel to use if not in North America—indicating Ford's obvious expectation that the Class Vehicles would be filled with American diesel fuel.

23.     Nevertheless, Ford has refused to honor its warranties, deviously claiming that the metal shavings caused by the failures of their pump design voided the warranty because they also caused fuel contamination.

24.     Despite the clear mis-match between the Bosch CP4 Pump and American diesel

fuel, Ford has cleverly passed the $8,000.00–$20,000.00 cost of failure along to the consumer. Moreover, Ford's agents, specifically its dealerships, are determining that CP4 pump failures are not under manufacturer warranty.  The logic is that when a European-designed CP4 pump mists internal diesel engine components, its innate incompatibility with less American diesel produces damaging levels of metal-on-metal friction, launching metal debris into the high-pressure fuel system and the engine.  Warranties do not cover the use of contaminated fuel.  Because the fuel is now contaminated with metal from the pump, the repairs are for fuel contamination and are  not covered by the warranties.

25.    Ford induced Plaintiffs and other Class members to pay a premium for increased durability, performance and fuel efficiency, with a design it has long known would cause fuel contamination—a condition Ford now uses to absolve itself of the catastrophic and costly consequences to Plaintiffs and other Class members.

26.    Plaintiffs would not have purchased their vehicles if they knew about this hidden fuel pump defect.

## CLASS ACTION ALLEGATIONS

### A.    Definition of the Classes

27.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following classes (collectively, the "Classes") because the class is so numerous that joinder of all members is impracticable; there are questions of fact or law common to the class, which common questions predominate over questions affecting only individual members; the representative parties will fairly and adequately protect the interest of the class; and the claims of the representative parties are typical of the claims of the class.

**Louisiana Class for Violations of Louisiana Law**

All persons or entities who are current or former owners and/or lessees of an "Affected Vehicle."  Affected Vehicles include, without limitation: All persons or entities in Louisiana who are current or former owners and/or lessees of 2011-present model year Ford diesel vehicles equipped with a Power Stroke 6.7L engine and/or CP4 fuel injection pump system.  Also excluded from the Class is any parent company, subsidiary or affiliate of Ford, all officers and directors who are or have been employed by defendant during the relevant period, and all judges and justices assigned to hear any aspect of this case.

**B.    The Prerequisites to Rule 23(a) Are Satisfied**

**1.    Numerosity**

28.    The Classes are comprised of thousands of members geographically dispersed throughout Louisiana are so numerous that joinder of all members is impracticable.  While the precise number of members of the classes are unknown to Plaintiffs, members of the Classes can be identified from records maintained by Ford and/or its agents.

**2.    Commonality**

29.    Questions of law and fact common to all members of the Classes predominate over any questions affecting only individual members.  Among the common questions are the following:

(a)    whether Ford engaged in the conduct alleged herein;

(b)    whether Ford knew about the CP4 defect and the inherent problems related thereto when said component part is used with American diesel fuel, and if so, how long Ford knew or should have known as much;

(c)    whether Ford designed, advertised, marketed, distributed, leased, sold, or otherwise placed the defective Class Vehicles into the stream of commerce in the United States;

(d)     whether the Ford diesel engine systems that are the subject of this complaint are defective such that they are not fit for ordinary consumer use;

(e)     whether Ford omitted material facts about the quality, durability, fuel economy, and vehicle longevity of the Class Vehicles;

(f)     whether Ford designed, manufactured, marketed, and distributed Class Vehicles with defective or otherwise inadequate fuel injection systems;

(g)     whether Ford's conduct violates Louisiana consumer protection statutes, and constitutes breach of contract or warranty and fraudulent concealment/omission, as asserted herein;

(h)     whether Plaintiffs and the other Class members overpaid for their vehicles at the point of sale;

(i)     whether Plaintiffs and the other Class members are entitled to equitable relief, including but not limited to, restitution or injunctive relief;

(j)     whether Plaintiff and the other Class members are entitled to damages and other monetary relief and, if so, in what amount;

(k)     whether defendants' conduct violates the Louisiana Products Liability Act and other Louisiana laws;

(l)     whether the Plaintiff and the other Class members experienced out of pocket losses as a result of the peeling paint defect and the amount of those losses;

(m)     whether Plaintiffs and the other Class members overpaid for their vehicles at the point of sale; and

(n)     Whether Plaintiffs and the other Class members are entitled to damages and

other monetary relief and, if so, what amount.

### 3.    Typicality

30.    Plaintiffs have claims that are typical of the claims of other members of the Classes because, among other things, all members of the Classes were comparably injured through Ford's wrongful conduct as described herein.

### 4.    Adequacy

31.    Plaintiffs will fairly and adequately represent and protect the interests of the Classes in that he has no interests that are antagonistic to or which irreconcilably conflict with those of other members of the Classes.  Plaintiffs have retained counsel competent and experienced in the prosecution of class action litigation.

### 5.    Superiority

32.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The financial detriment suffered by Plaintiffs and the other members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Ford.  Accordingly, it would be impracticable for the members of the Class to individually seek redress for Ford's wrongful conduct. Even if members of the Class could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

C.    **This Action May Be Maintained as a Class Action**

1.    **The Requirements of Rule 23(b)(3) are Satisfied**

33.    As noted above, there are numerous questions of law and fact common to the

which predominate over any questions affecting only individual members.  Moreover, a class

action is superior to all other available methods for the fair and efficient adjudication of this

controversy.  Such treatment will permit a large number of similarly situated, geographically

dispersed persons or entities to prosecute their common claims in a single forum simultaneously,

efficiently, and without unnecessary duplication of evidence, effort or expense that numerous

individual actions would engender.  The benefits of proceeding through the class mechanism,

including providing injured persons or entities a method for obtaining redress on claims that could

not practicably be pursed individually, substantially outweighs potential difficulties in

management of this class action.

2.    **The Requirements of Rule 23(b)(3) are Satisfied**

34.     Ford has acted or refused to act on grounds generally applicable to Plaintiffs and

the other members of the Classes, thereby making appropriate final injunctive relief and

declaratory relief, as described below, with respect to the Class as a whole.

## CAUSES OF ACTION

## BREACH OF CONTRACT

(Louisiana Class)

35.    Plaintiffs incorporates herein by reference, as though fully set forth at length, each

and every allegation and statement contained in the foregoing paragraphs.

36.    Plaintiffs plead their claim for breach of contract in the alternative to their claim for

unjust enrichment.

37.     Ford's misrepresentations and omissions alleged herein, including Ford's intentionally concealing and suppressing material facts concerning the durability and performance of the Bosch CP4 Pump and (more importantly) facts concerning the durability and performance of the Class Vehicles and their engines, in order to defraud and mislead the Class about the true nature of the Class Vehicles and their engines, caused Plaintiffs and the other Class members to make their purchases or leases of the vehicles in question.

38.     Absent those misrepresentations and omissions, Plaintiffs and the other Class members would not have purchased or leased their vehicles, would not have purchased or leased these vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain peeling paint.  Accordingly, Plaintiffs and those similarly situated putative class members overpaid for the Affected Vehicles and did not receive the benefit of their bargain.

39.     Each and every sale or lease of such vehicle constitutes a contract between Ford and the purchaser or lessee.  Ford breached these contracts by selling or leasing Plaintiffs and the other similarly situated putative class members defective vehicles and by misrepresenting or failing to disclose the Bosch CP4 Pump's ability to use American diesel, and thus less valuable, than vehicles that do not have the Bosch CP4 Pump.

40.     As a direct and proximate result of Ford's breach of contract, Plaintiffs and those similarly situated should have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## NEGLIGENT MISREPRESENTATION

(Louisiana Class)

41.    Plaintiffs incorporate herein by reference, as though fully set forth at length, each and every allegation and statement contained in the foregoing paragraphs.

42.    In making misrepresentations regarding the quality and performance of the Affected Vehicles, Ford was acting in the course of its regular business, and in relation to transactions in which it has a pecuniary interest.

43.    The information that Ford provided regarding the engine performance was false.

44.    Ford  intended that Plaintiffs and those similarly situated consumers would be guided by and rely on such representations in the course of making a decision to purchase one of the Affected Vehicles.

45.    Ford failed to exercise reasonable care in ensuring that the Affected Vehicles could function with American diesel, and failed to exercise reasonable care in representing the engine quality with the Affected Vehicles.

46.    Plaintiffs and those similarly situated were reasonable and justified in relying on Ford's representations about the Affected Vehicles.

## BREACH OF EXPRESS WARRANTY

(Louisiana Class)

47.    Plaintiffs incorporate herein by reference, as though fully set forth at length, each and every allegation and statement contained in the foregoing paragraphs.

48.    This claim is brought by Plaintiffs on behalf of themselves individually and the other Class members.

49.    At all relevant times hereto, Defendant was the manufacturer, distributor,

warrantor, and/or seller of the Affected Vehicles. Defendant knew or should have known the specific use for which the Affected Vehicles were purchased.

50.    Defendant designed, developed, manufactured, marketed, sold leased, warranted, and promoted the Affected Vehicles as a vehicle that was of good quality, durable, and functional.

51.    The foregoing advertisements, promotions, recommendations, representations, and/or statements made by Defendant became part of the basis for the Plaintiffs' purchase and use of the vehicle from Defendant, thus creating an express warranty that the vehicle would conform to the recommendations, representations, and/or statements.

52.    Notwithstanding the foregoing warranties, Plaintiffs' vehicles contained a severe fuel pump defect and was unreasonably fit for its intended or reasonably foreseeable use.

53.    Defendant breached the foregoing express warranties that Plaintiffs' vehicles were fit for use as a vehicle of good quality, durability, and functionality.

54.    As a direct and proximate result of the breach of the express warranty by Defendant, Plaintiffs sustained loss of money, loss of property, and/or diminished value of their vehicles.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

(Louisiana Class)

55.    Plaintiffs incorporate herein by reference, as though fully set forth at length, each and every allegation and statement contained in the foregoing paragraphs.

56.    This claim is brought by Plaintiffs on behalf of themselves individually and the other Class members.

57.    At all relevant times hereto, Defendant was the manufacturer, distributor, warrantor, and/or seller of the Affected Vehicles. Defendant knew or should have known the specific use for which the Affected Vehicles were purchased.

58.     There was an implied warranty by Defendant that the Affected Vehicles, and any parts thereof, were merchantable and fit for the purpose for which they were sold. The Affected Vehicles, however, are not fit for their ordinary purpose because the Affected Vehicles contained the fuel pump defect at the time of the sale and/or lease.

59.     The Affected Vehicles are not fit for the purpose of providing a durable, functional, and reliable vehicle because of the fuel pump defect.

60.     Defendant impliedly warranted that the Affected Vehicles were of a merchantable quality and fit for such use.  This implied warranty included, *inter alia*, a warranty that the Affected Vehicles and their component fuel pumps, supplied, distributed, leased and/or sold by Defendant were reliable, functional, and durable, and would not experience the paint defect described herein.

61.     Contrary to the applicable implied warranties, the Affected Vehicles and their exterior paint at the time of the sale and thereafter were not fit for their ordinary and intended purpose.  Instead, the Affected Vehicles contain a defective Bosch CP4 Pump.

62.     At all relevant times hereto, Plaintiffs used their vehicles in a manner that was intended and/or reasonably foreseeable by Defendant.

63.     Examination of the Affected Vehicles by Plaintiffs before purchase and/or use would not have revealed or made obvious the unfitness of the Affected Vehicles.

64.     Defendant breached the implied warranty of merchantability, and Plaintiffs' injuries and damages were a direct and proximate result of the breach of such implied warranty by defendants.

65.     As a direct and proximate result of the breach of the implied warranty by Defendants, Plaintiffs sustained loss of money, loss of property, and/or loss of value of their vehicles.

**DESIGN DEFECT**

(Louisiana Class)

66.    Plaintiffs incorporates herein by reference, as though fully set forth at length, each and every allegation and statement contained in the foregoing paragraphs.

67.    This claim is brought by Plaintiffs on behalf of themselves individually and the other Class members.

68.    At all relevant times hereto, Defendant was the manufacturer, distributor, warrantor, and/or seller of the Affected Vehicles which contained a severe paint defect.

69.    Plaintiffs aver that an alternative design of the engine, specifically the Bosch CP4 Pump, was capable of preventing Plaintiffs' damages.

70.    Plaintiffs aver that the Bosch CP4 Pump of the Affected Vehicles was defective, and the likelihood that its defective design would cause Plaintiffs' damages outweighed any burden on Defendant to design, manufacture, distribute, handle, promote, lease, and/or sell an alternative and safer design.

71.    As a direct and proximate result of Defendant's actions, Plaintiffs sustained loss of money, loss of property, and/or loss of value to their vehicles.

**INADEQUATE WARNING**

(Louisiana Class)

72.    Plaintiffs incorporate herein by reference, as though fully set forth at length, each and every allegation and statement contained in the foregoing paragraphs.

73.    This claim is brought by Plaintiffs on behalf of themselves individually and the other Class members.

74.    At all relevant times hereto, Defendant was the manufacturer, distributor,

warrantor, and/or seller of the Affected Vehicles which contained the Bosch CP4 Pump.

75.    Defendant failed to use reasonable care to provide a reasonable and adequate warning with the Affected Vehicles to adequately warn of the unreasonably fit characteristics of the Affected Vehicles.  The Affected Vehicles presented a serious risk of Bosch CP4 Pump failure, and Defendant designed manufactured, distributed, handled, promoted, leased, and/or sold the Affected Vehicles without a warning and/or without an adequate warning to inform Plaintiffs and other users of the defects.

76.    Plaintiffs aver that absent such an adequate warning, an ordinary user such as Plaintiffs would not be aware of the defective and unfit characteristics of the Affected Vehicles.

77.    As a direct and proximate result of the inadequate warning, Plaintiffs sustained loss of money, loss of property, and/or loss of value of their vehicle.

## REDHIBITION

### (Louisiana Class)

78.    Plaintiffs incorporates herein by reference, as though fully set forth at length, each and every allegation and statement contained in the foregoing paragraphs.

79.    This claim is brought by Plaintiffs on behalf of themselves individually and the other Class members.

80.    At all relevant times hereto, Defendant was the manufacturer, distributor, warrantor, and/or seller of the Affected Vehicles which contained a Bosch CP4 Pump.

81.    Defendants as manufacturers and vendors are liable to Plaintiff under the law of redhibition (Louisiana Civil Code Article 2509 as a bad faith seller and Louisiana Civil Code Article 2520 for economic loss *et seq.*).

## LOUISIANA UNFAIR TRADE PRACTICES
## AND CONSUMER PROTECTION LAW

(Individual Claim Under La. R.S. 51:1401, e*t seq.*)

82.    Plaintiffs incorporate herein by reference, as though fully set forth at length, each and every allegation and statement contained in the foregoing paragraphs.

83.    This claim is brought by Plaintiffs' themselves individually and the other Class members.

84.    Ford and Plaintiffs are "persons" as that term is defined by La. R.S. 51:1401, e*t seq.*

85.    Plaintiffs are "consumers" as that term is defined by La. R.S. 51:1401, e*t seq.*

86.    Ford engaged in "trade," "commerce," or "consumer transactions" as those terms are defined by La. R.S. 51:1401, e*t seq.*

87.    The Louisiana Unfair Trade Practices Act (LUTPA) prohibits unfair or deceptive acts.  La. R.S. 51:1401, e*t seq.*

88.     Ford sold Affected Vehicles in Louisiana and throughout the United States during the relevant period.

89.    Ford violated the Louisiana Unfair Trade Practices Act (LUTPA) when it represented, through advertising, warranties, and other express representations, that the Affected Vehicles had characteristics and benefits that they did not actually have.

90.    Ford violated the Louisiana Unfair Trade Practices Act (LUTPA) when it represented, through advertising, warranties, and other express representations, that the Affected Vehicles were of a particular standard or quality when they were not.

91.    Ford violated the Louisiana Unfair Trade Practices Act (LUTPA) by failing to place vehicles with defective fuel pumps into an extended warranty program.

92.     Ford's violations occurred in connection with its conduct of trade or commerce in Louisiana and throughout the United States.

93.     Ford's violations caused the Plaintiffs to purchase their vehicles, which he would not otherwise have purchased had he known the true nature, quality and characteristics of the Affected Vehicles.

94.     Ford willfully and knowingly violated the Louisiana Unfair Trade Practices Act with the intent to deceive and mislead Plaintiffs and other consumers and to induce them to purchase Affected Vehicles at higher prices, which did not match the Affected Vehicles' true value.

95.     As a result of Ford's unlawful business practices, Plaintiffs are entitled to an award for his actual damages, treble damages, attorneys' fees and costs pursuant to La. R.S. 51:1401, *et seq*.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiffs, **GARRISON BUILDERS, LLC** and **SANDERSON SERVICES, LLC,** individually and on behalf of members of the Class, respectfully request that the Court enter judgment in their favor and against Ford, as follows:

A.     Certification of the proposed Classes in accordance with Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, including appointment of Plaintiffs' counsel as Class Counsel;

B.     An order temporarily and permanently enjoining Ford from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged herein;

C.     Injunctive relief in the form of a recall, free replacement, or buy-back

program;

D.      A judgment against Ford and in favor of Plaintiffs and the class they seek

to represent for costs, restitution, damages, including punitive damages, and

disgorgement in an amount to be determined at trial;

E.      An order requiring Ford to pay both pre- and post- judgment interest on any

amounts awarded;

F.      An award of costs and attorneys' fees; and

G.      Such other and further relief as this Court deems just and proper.

Respectfully submitted,

MARTZELL BICKFORD & CENTOLA

    /s/ Lawrence J. Centola
**LAWRENCE J. CENTOLA, III (#27402)**
338 Lafayette Street
New Orleans, Louisiana 70130
(504) 581-9065
(504) 581-7635 (Fax)

LILLIS LAW FIRM
**MICHAEL E. LILLIS (#33245)**
338 Lafayette Street
New Orleans, Louisiana 70130
Telephone:      (504) 581-9065
Facsimile:      (504) 581-7635

**COUNSEL FOR GARRISON
BUILDERS, LLC, SANDERSON
SERVICES, LLC and All Others
Similarly Situated**

PLAINTIFFS WILL REQUEST WAIVER OF SERVICE IN ACCORDANCE WITH RULE 4D